

# United States District Court

### NORTHERN DISTRICT OF GEORGIA

FILED IN CHAMBERS
U.S.D.C. Atlanta

MAY 0 3 2011

~~ISSUED AND DELIVERED~~
~~TO U.S. MARSHAL~~

_2/3/11_

BY: _____

DEPUTY CLERK

UNITED STATES OF AMERICA

v.

KRISTEN NOELL GODUTO, and
KORY JOSEPH GODUTO

**CRIMINAL COMPLAINT**

By: _____ HATTEN, Clerk

CASE NUMBER: 1:11-MJ-641

Deputy Clerk

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Between on or about <u>August 13, 2009</u>, to <u>March 23, 2011</u>, in at least <u>Cobb, Bartow, Fannin and Fulton</u> Counties, in the Northern District of Georgia defendant(s) did

knowingly and intentionally conspired and agreed with each other to possess with the intent to distribute a controlled substance, namely oxycodone, a Schedule II controlled substance

in violation of Title <u>21</u> United States Code, Section(s) <u>846</u>.

I further state that I am a(n) DEA Special Agent and that this complaint is based on the following facts:

Please See Attached Affidavit

Continued on the attached sheet and made a part hereof.

(X) Yes ( ) No

Signature of Complainant
Christopher A. Mueller

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

<u>May 3, 2011</u>    at    <u>Atlanta, Georgia</u>
Date                    City and State

Russell G. Vineyard
<u>United States Magistrate Judge</u>
Name and Title of Judicial Officer          Signature of Judicial Officer
AUSA Elizabeth M. Hathaway/(404) 581-6098

## AFFIDAVIT

I, Christopher A. Mueller, being duly sworn, hereby depose and state that the following is true and correct to the best of my knowledge and belief:

## AFFIANT'S BACKGROUND

1.      I am an investigative law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.      I am employed as a Special Agent by the Drug Enforcement Administration ("DEA"), United States Department of Justice, and I have been employed in this capacity for approximately 12 years. I am currently assigned to the Atlanta Field Division, Rome Post of Duty. Prior to becoming a Special Agent with the DEA, I was employed by the City of Newport News, Virginia as a Police Officer and Park Ranger.

3.      During my tenure as a DEA Special Agent, I have investigated and participated in investigations of organized criminal groups violating federal drug trafficking laws. As part of my official duties, I have utilized most traditional law enforcement techniques, including visual surveillance, interviewing of witnesses, the execution of search warrants, the use of cooperating witnesses, the seizure of drug evidence, the controlled purchases of drug evidence, court authorized pen registers,

court authorized interceptions of wire communications, the federal grand jury, and undercover techniques. I have debriefed numerous cooperating defendants and confidential informants regarding the habits, practices, methods and general behavior of criminal groups engaged in organized criminal activity. I have personally participated in Title III wire intercept investigations, including investigations involving large scale drug trafficking organizations and importers of controlled substances and investigations that include the use of various types of computer equipment by the suspects for communication, forgery and wire fraud.

4.      I have received specialized training in conducting drug investigations and have attended numerous conferences and lectures featuring government attorneys and law enforcement officials. Over the course of my career, I have participated in numerous arrests of known drug traffickers and their associates. This experience has afforded me an opportunity to observe and investigate methods, schemes, and operations used by organized groups, including the use of cellular telephones and of digital display paging devices, and their use of numerical codes and code words to conduct their transactions.   In addition, I have participated in investigations concerning the concealment of proceeds of controlled substances, including assets, monies, and bank records, and the identification of co-conspirators through the use of drug ledgers, telephone toll records, telephone bills, photographs, and financial

2

records. These investigations have resulted in the arrest of individuals who have imported, smuggled, received, and/or distributed controlled substances, including methamphetamine, cocaine hydrochloride, cocaine base, marijuana and oxycodone, as well as the seizure of controlled substances and the proceeds of the sale of these controlled substances.

5.     This affidavit is made in support of a criminal complaint and arrest warrants charging Kristen Noelle Goduto ("GODUTO") and Kory Joseph Goduto ("KORY")[1] with violating Title 21, United States Code, Section 846: Conspiracy to Possess a Controlled Substance (namely oxycodone, a Schedule II controlled substance) with the Intent to Distribute.

## BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT

6.     I make this affidavit based upon personal knowledge derived from my participation in this investigation, conclusions I have reached based on my training and experience, and upon information I believe to be reliable from the following sources:

a.     Physical surveillance conducted by federal agents and local law enforcement officers;

---

[1] Kristen GODUTO and Kory GODUTO are siblings. To avoid confusion, Kristen GODUTO will be referred to as GODUTO, while Kory GODUTO will be referred to by his first name, KORY.

b.     Drug and non-drug evidence seized as part of this and related investigations;

c.     Discussions with other investigators of the DEA and local law enforcement officers, as well as a review of reports written by other law enforcement officers;

d.     A review of telephone toll information and subscriber information; and

e.     A review of the consensually recorded meeting between a CS, GODUTO and KORY.

7.     In addition, except where otherwise noted, the information set forth in this affidavit has been provided, directly or indirectly, by Special Agents of the DEA and/or other law enforcement personnel.  Unless otherwise noted, whenever I assert in this affidavit that a statement was made, it should be known that the information was provided by other law enforcement personnel (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.  Such statements are among many statements made by others and are stated in substance, unless otherwise indicated.  Similarly, information resulting from surveillance, except where indicated, does not necessarily set forth my

4

personal observations, rather it has been provided either directly or indirectly by other law enforcement personnel who conducted such surveillance.

## STATEMENT OF PROBABLE CAUSE

8.    Since 2009, your affiant has been involved in the investigation of GODUTO, KORY, and others who have been engaged in obtaining oxycodone and other narcotics through the uttering of forged prescriptions at pharmacies throughout the Northern District of Georgia.

### GODUTO's August 13, 2009 Passing of Forged Prescriptions

9.    On November 11, 2009, the Cobb County Sheriff's Office received a report of the passing of several forged prescriptions for oxycodone at a Publix Pharmacy in Marietta, Georgia. As part of that investigation, the staff of the pharmacy provided video surveillance footage of an individual passing and successfully filling a forged prescription for 90 30mg oxycodone and 60 2mg Xanax on August 13, 2009. Your affiant has since viewed that footage and identified the suspect as GODUTO. The prescription was certified as a forgery by the prescribing physician's office.

5

**KORY's February 4, 2010 Aiding an Attempt to Pass Forged Prescriptions**

10.   On February 4, 2010, at approximately 11:22AM, the Adairsville, Georgia, Police Department received a call about a forgery occurring at the Bradley and Bandy Pharmacy in Adairsville. When the officer arrived, he observed a white male sitting in a chair, and was informed by a pharmacy employee that he was the individual who passed the suspicious prescription. The prescription was for 120 30mg oxycodone tablets. The employee informed the officer that she was trying to verify the prescription. At some point, the suspect suddenly got up and started running toward the front door of the pharmacy. Another police officer who had arrived chased the suspect. The suspect was ultimately arrested for forgery (the pharmacy employee informed the officers that she had contacted the doctor's office and the doctor's office confirmed the prescription was a forgery).

11.   A cellular telephone possessed by the suspect was recovered and searched. The telephone showed that, at 11:19AM, the suspect sent a text to "KORY" stating "Lady just went back she is out now." Then, at 11:21am, "KORY" texted back "How is she acting"? At 11:22, the suspect responded, "OK I guess." Based on this investigation, your affiant believes that KORY was acting as a lookout for the suspect inside the pharmacy, and was communicating with the suspect to assess the likelihood of the forgery being discovered.

6

12.    The contact list inside the suspect's telephone showed that the telephone number for "KORY" was 312-513-9633. Based on your affiant's review of telephone records, your affiant knows that 312-513-9633 was in contact with phones used by GODUTO hundreds of times. In addition, there was an entry in the suspect's phone for "Kory mom" with a number subscribed to in the name of KORY's mother. Finally, on September 30, 2010, your affiant participated in a federal search warrant executed as a part of this investigation. Pursuant to the warrant, agents searched the cellular telephone of the individual at the premises searched. That telephone listed the contact number for "Kory Goduto" as 312-513-9633. Accordingly, I believe that it was KORY who was assisting the suspect in attempting to pass the prescription at the Bradley and Bandy Pharmacy.

**GODUTO's August and September 2010 Passing of Forged Prescriptions**

13.    On September 24, 2010, a confidential source (CS) of the DEA[2] was directed to meet with GODUTO at GODUTO's residence, located at 2426 Cape Sable Drive, Marietta, Georgia ("GODUTO's residence"), for the purpose of conversing

---

[2] The CS has been cooperating with agents of the DEA for approximately ten months and is currently on bond after having been charged with 2nd degree forgery. The CS is motivated to cooperate in hopes of a reduced sentence. In the time the CS has been cooperating, your affiant has been able to independently corroborate information provided by the CS through interviews of other independent witnesses, physical surveillance and the seizure of evidence. Your affiant has found the CS to be truthful and reliable. The CS has only the one previous arrest for the charge on which he/she is on bond, and has no convictions.

with her about the passing of illegal prescriptions.  The CS was provided with a recording device to corroborate the incident and was searched prior to the meeting by your affiant and found to be contraband free. The CS was surveilled to the GODUTO's residence where he/she was directed into the house. Once inside the house, the CS met briefly with KORY, who also lives there.  Your affiant has reviewed the recordings of this meeting.

14.    After the CS arrived, GODUTO arrived at the residence, and the CS, GODUTO and KORY all met in KORY's bedroom, where they had conversation about the passing of prescriptions at various pharmacies in the Northern District of Georgia, paying for the prescriptions, and how those they directed to pass the prescriptions were being paid. Specifically, GODUTO told the CS that she needed to pick up a prescription at Sam's.  GODUTO stated that the prescription was ready for pickup.  GODUTO stated that she had also been to the CVS Pharmacy on Honeycreek and stated that it is always easy to pass prescriptions there. The CS asked GODUTO if she had anything (meaning prescriptions) ready and offered to drop one off. GODUTO did not respond, but started to speak with KORY.  KORY stated that GODUTO paid "Ann" the one hundred ($100) that GODUTO owed her, and one hundred and forty ($140) "because [we] split so Ann is taken care of."  KORY then listed of prices stating, "the first one cost one-twenty, the second one cost one-fifty

8

and the third one cost one-seventy-five." GODUTO responded that she had provided KORY five-ten ($510) and stated that she gave him an amount of money in front of an individual named "Levi." They then discussed paying "Ann" once again. KORY stated that "Ann" took six pills which reduced what they owed "Ann" to two-eighty ($280). KORY went on to explain that they split the debt, each paying "Ann" one-forty ($140). KORY then stated, "After the prescriptions, you would only owe me thirty-two bucks."

a. Based on the context of the conversation, your affiant's investigation to date, and the understanding of the CS, the entire conversation was regarding the passing of prescriptions by a female named "Ann" for payment in cash and oxycodone pills.

15. After the conversation ended, the CS followed GODUTO to her bedroom. As they walked, the CS asked GODUTO if GODUTO had anything for the CS. GODUTO said that "all [her] shit" was at "Mark's house." When the CS asked what GODUTO was referring to, GODUTO replied "papers." GODUTO then provided the CS with three alprazolam (Xanax ®) tablets for free and invited the CS to meet with her the following day. The CS understood this to mean they would meet for the purpose of passing forged prescriptions the following day. The CS departed

9

after several minutes and met with your affiant and turned over the three alprazolam. The CS was searched and found to be contraband free.

16.    On September 29, 2010, your affiant traveled to Sam's Club at 150 Cobb Parkway, Marietta, Georgia and met with the pharmacy staff. Your affiant discovered two forged prescriptions, each for 120 30mg oxycodone pills, passed under the name "Mable Vietch." The first was dropped off at the pharmacy on August 20, 2010 at approximately 3:24PM and picked up one hour later. The second was dropped off on September 24, 2010 at approximately 4:01PM (the date GODUTO met with the CS and informed the CS that she needed to pick up a prescriptions at Sam's) and picked up on September 25, 2010 at approximately 10:53AM. Your affiant contacted the prescribing physician's office and verified that "Mable Vietch" was not a patient of theirs and the prescribing physician had not written a prescription for "Mable Vietch."

17.    Next, your affiant met with security for Sam's Club and reviewed the security footage surrounding the times the prescriptions were dropped off and picked up.  In each instance, the video footage showed GODUTO either dropping off the forged prescription or picking up the oxycodone pills.

10

**GODUTO's Participation in Passing Forged Prescriptions on March 23, 2011**

18.     On March 23, 2011, your affiant and other members of DEA conducted a surveillance at GODUTO's residence. While there, agents observed an individual sitting on the front porch at the GODUTO's residence. After the individual departed, he was surveilled to various pharmacies in North West Georgia. At approximately 3:39PM, your affiant observed him enter the Blue Ridge Pharmacy located at 793 East Main Street, Blue Ridge, Georgia. While walking across the street to enter the pharmacy, your affiant observed that he had a full size sheet of blue paper in his hand, consistent with security paper used on forged prescriptions that had been passed and recovered by law enforcement in this investigation. After several moments, the individual left the pharmacy and departed in his car. At the same moment, Special Agent Tim Spears entered the pharmacy and spoke with the staff. SA Spears discovered that the individual had dropped of a prescription for 120 30mg oxycodone tablets and had allegedly departed to go to an automatic teller machine. SA Spears also learned that the individual had successfully passed another prescription approximately 30 days before, also for 120 30mg oxycodone pills.

19.     While SA Spears was inside the pharmacy, your affiant surveilled the individual drive around the block several times, but never stopped at an automatic teller machine. The individual then parked in front of the Blue Ridge Pharmacy again

11

and went inside. SA Spears, who had remained inside the pharmacy, observed the individual obtain the 120 30mg oxycodone pills as per the prescription, pay for the prescription in cash and depart. SA Spears recovered the two prescriptions the individual had passed at the pharmacy and turned them over to your affiant. Later, your affiant checked with the office of the prescribing physician and verified that the individual was not a patient and that the prescriptions were forgeries.

20.     Surveillance of the individual continued throughout the day. During that surveillance, investigators observed the individual stop and park in front of four additional pharmacies, but never enter them.  The individual then drove from Fannin County, Georgia to Alpharetta, Georgia where your affiant observed him meet with GODUTO in a parking lot of a gas station.  During the meeting, investigators observed the individual hand GODUTO several sheets of blue paper that she placed in a brightly colored shoulder bag she was carrying.  Following the meeting, surveillance of the individual was terminated and the investigators began a surveillance of GODUTO who was in the company of another male individual.

21.     During the surveillance of GODUTO and the individual that followed, your affiant observed GODUTO drive the individual to a Walgreens on Alpharetta Highway.  After the individual departed the pharmacy, SA Spears entered the Walgreens and spoke to the staff. They reported that the individual had attempted to

12

pass a prescription for 120 30mg oxycodone pills, but they were uncomfortable with him, so they refused him service by telling him they had no oxycodone. At the same time, your affiant surveilled GODUTO drive the individual to a CVS Pharmacy on Highway 92 in Roswell, Georgia. Your affiant followed the individual into the pharmacy and observed him meet with the pharmacist and attempt to pass a prescription on blue security paper. The pharmacist refused service, and the individual departed. Your affiant spoke with the pharmacist who stated that he believed the prescription to be a forgery and advised it was for 120 30mg oxycodone pills.

## FURTHER STATEMENT OF PROBABLE CAUSE

22.     I know that certain pharmaceutically prepared schedule II narcotics such, as tablet preparations of oxycodone in various dosage amounts, are frequently sold in bulk quantities of 90 to 240 pills or more to individuals throughout the United States but often in cities such as Jacksonville, Florida; Ft. Lauderdale, Florida; and in the Atlanta, Georgia Metro Area for between $1 and $6 each for a 30 milligram immediate release oxycodone tablet. Some of these individuals (often referred to as SMURFS) shop at multiple locations to obtain the oxycodone and are sponsored by a person who directs them to fill prescriptions (SPONSORS). This SPONSOR sometimes manufactures the paper script and pays for the prescriptions and then pays

13

the SMURF either cash or in oxycodone for the service of filling the prescriptions. SPONSORS often have many SMURFS working for them in order to stockpile large amounts of oxycodone or other desired commercially available narcotics. The stockpiled narcotics are then diverted from their legal use to the illicit street drug markets throughout the United States but very frequently in Georgia, Florida, Tennessee, and Kentucky. The bulk stockpiles of drugs are smuggled to the various localities by vehicle, commercial parcel delivery service or other common smuggling methods where they are then distributed in various quantities to midlevel and street level narcotics dealers for between $13 and $17 per pill. These dealers then resell the narcotics in quantities as small a single pill or more for as much as $25 each pill for 30 milligram oxycodone preparations or as much as $1 per milligram of active ingredient in preparations of as large as 80 milligram.

## **CONCLUSION**

23. Based the foregoing, viewed in light of on my training and experience, I believe that probable cause exists to believe that Kristen Noelle GODUTO and Kory Joseph GODUTO, conspired to possess a controlled substance (namely, oxycodone, a Schedule II controlled substance) with the intent to distribute, in violation of Title 21, United States Code, Section 846.

14