IN THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.                                                          CRIMINAL ACTION NO.
                                                            1:11-CR-230-JEC-GGB

KRISTEN GODUTO, et al.,
    Defendants.

## SENTENCING MEMORANDUM OF KRISTEN GODUTO

COMES NOW Kristen Goduto, Defendant herein, by and through undersigned counsel, and this Sentencing Memorandum in advance of her sentencing hearing, currently scheduled for May 10 and 13, 2013. In this memorandum, Ms. Goduto will outline several arguments as to why her sentence should fall well below that advocated by the probation officer in the pre-sentence investigation report. First, the treatment of oxycodone by the United States Sentencing Commission is not supported by empirical data and has no scientific or legal basis; the appropriate conversion ratio of oxycodone to marijuana should not be 1:6700. Second, there is no basis for assessment of a firearm enhancement under USSG §2D1.1(b)(1). Third, there is no basis for a conclusion that Ms. Goduto maintained a "criminal livelihood" under USSG §2D1.1(b)(14)(E). Fourth, Criminal History III overrepresents Ms. Goduto's actual criminal background. Finally, the Court should consider Ms. Goduto's social, familial,

educational, medical, and psychological background as significant factors warranting a variance from the guideline sentence, pursuant to 18 USC 3553(a)(1).

**I.  The conversion ratios employed by the Sentencing Commission with regard to oxycodone is not based on empirical data and/or rational experience, are arbitrary and capricious, do not exemplify the Commission's exercise of its characteristic institutional role, and rest upon faulty assumptions.**

**A.  The Court has the authority to disagree on policy grounds with the Guidelines.**

Sentencing judges may impose sentences that vary from guideline ranges if they disagree with a particular Commission policy.  Kimbrough v. United States, 552 U.S. 85, 109-110 (2007); United States v. Corner, 598 F.3d 411 (7th Cir. 2010); United States v. Merced, 603 F.3d 203 (3d Cir. 2010); United States v. Mitchell, 624 F.3d 1023, 1030 (9th Cir. 2010); United States v. Stone, 575 F.3d 83, 89 (1st Cir. 2009), United States v. Carr, 557 F.3d 93, 106 (2nd Cir. 2009); see United States v. Dossie, 851 F.Supp. 2d 478 (E.D.N.Y. 2012) (sentencing a defendant in a drug trafficking case below the guidelines range where district court has underlying policy disagreement with the USSG 2D1.1 as a whole and holding that the district court's authority to vary is at its greatest where the offense guideline at issue is not the product of the Commission's empirical analysis and technical expertise).

In addressing the sentencing disparities in crack and powder cocaine, the Supreme Court acknowledged that the USSC was established "to formulate and constantly revise national sentencing standards," and that, "in fulfilling this important institutional role," the Commission draws on a "capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise." United States v. Diaz, unreported memorandum, E.D.N.Y. Jan. 28, 2013 (quoting Kimbrough, 552 U.S. at 108-09). When an offense guideline is based on the Commission's analysis of empirical data and national experience, the advisory ranges it produces can fairly be said to "reflect a rough approximation of sentences that might achieve objectives of the [Sentencing Reform Act]." Id. In short, the appellate courts should look more closely at sentences outside the applicable guidelines range where the Commission's assessment of a the particular guideline imposed is supported by empirical data and national experience. However, where a variance is based on a policy disagreement with guidelines "not based on empirical data and national experience, and hence 'do not exemplify the Commission's exercise of its characteristic institutional role,'" appellate courts should defer to the sentencing judge's reasonable policy disagreement with the guidelines. Id. (quoting Rita v. United States, 551 U.S. 338, 350 (2007).

**B. The Court should disagree on policy grounds with the conversion ratio of oxycodone to marijuana.**

Prior to November 1, 2003, the Drug Equivalency Tables contained in USSG2D1.1(c) contained, in relevant part, the following conversion ratios:

> 1 gm of Oxycodone=.5 gm of heroin
> 1 gm of Morphine= .5 gm of heroin
> 1 gm of Marihuana/Cannabis= 1 mg of heroin

Therefore, based on these ratios, the ratio of oxycodone to marijuana was 1:500; the ratio of morphine to marijuana was the same. Heroin's ratio to marijuana was twice that of both oxycodone and morphine.

These ratios remained intact until November 1, 2003, when Amendment 657 went into effect, making the ratio of oxycodone to marijuana 1:6700. The ratio of heroin and other opiate drugs remained the same, so, suddenly, the ratio of oxycodone to heroin was increased by more than 13 times, to 1:6.7. The Commission proposed Amendment 657, based on the following reasoning: because oxycodone was generally found, at that time, in two different prescription formulations—Percoset and OxyContin. Up until enactment of the amendment, penalties were established based on the entire weight of the pill. The Commission reasoned that, because Percoset generally contained approximately 10 mg of oxycodone (with a balance of the nonprescription drug acetaminophen), and OxyContin could contain up to three different amounts of oxycodone per tablet (with a balance of other chemicals largely responsible for the sustained release

property), there were perceived proportionality issues. *See Amendment 657, Guidelines Manual (2003 ed.)*, Appendix C, Part II (pp. 387-88). Therefore, the Commission elected to use the weight of "actual" oxycodone, rather than the weight of a given pill, to address this problem. It took as a basis a "typical" OxyContin pill, weighing 135 milligrams and containing approximately ten milligrams of oxycodone, but forewent mathematical consideration of other formulations containing 20, or even 40, milligrams in a tablet of the same overall size, 135 milligrams. Although the mathematical conversation is not detailed in the proposed amendment, requests for comment, or testimony to Congress related to this change, it appears that the Commission took the "old ratio" of 1 mg oxycodone= 500 mg marijuana and reformulated it for a 135 mg OxyContin tablet, making 500 mg marijuana= 135 mg OxyContin. In short,

$$\frac{500 \text{ mg marijuana}}{X(\text{oxycodone})} = \frac{10 \text{ mg oxycodone}}{135 \text{ mg OxyContin}}$$

$$10x = 67{,}500$$
$$x = 6{,}750$$

However, had the Commission used the OxyContin tablets containing 20 mg or 40 mg, the ratio would have been lower-- 1:3375, or 1:1687, respectively. There is no explanation for why the Commission chose the 10 mg formulation over the other two possibilities, or even why it chose to use OxyContin over Percoset or the generic form, oxycodone. The Commission held no public hearing and

reported absolutely *no* empirical data, *no* scientific studies, *not even bare conclusions* as to why it chose to increase the overall punishment for crimes involving oxycodone, other than a blanket statement that "the illicit market for oxycodone has grown". *See Minutes of USSC Public Meeting* 3/26/2003 (Department of Justice agrees to "continue to monitor the area" and "to bring to the Commission's attention any unintended effects resulting from the proposed amendment.") No reported conversations related to the efficacy of this amendment have taken place, and USSC General Counsel said nothing about this particular amendment in his subsequent quarterly report to Congress. In fact, in proposing the amendment, the Commission agreed that, because this amendment would effectively lower sentences for Percoset offenses, the amendment would present a retroactivity issue, but it does not appear that such an issue was ever addressed by the Commission.

At defense counsel's request, Dr. Jimmie L. Valentine has reviewed the pre- and post-Amendment 657 guidelines, and has compiled a report based on his own expertise, experience, and research in the areas of pharmacology and toxicology. A copy of the report is appended hereto. Dr. Valentine's expert conclusion was that, first, the equianalgesic relationship, method of administration, and side effects were the same for oxycodone and morphine; therefore, they are more appropriately

compared than oxycodone and other drugs covered under the Drug Equivalency Table.

Second, both OxyContin and oxycodone tablet weights are based on the weight of the hydrochloride salt form and should be reduced by 10.2% in order to achieve the weight of the active drug.

Finally, heroin is a Schedule I substance with no acceptable medical use and whose addictiveness and social costs are well known, whereas oxycodone is a Schedule II drug that is appropriately used in pain management for its analgesic effects. Therefore, the current, possible inadvertent, conversion ratio that makes oxycodone 6.7 times more dangerous than heroin, *as well as every other substance covered by the Guidelines,* is not scientifically sound.

At the May 10, 2013, hearing, counsel intends to introduce the testimony of another pharmacologist, Dr. Randall Tackett, whose curriculum vitae is appended to this memorandum for the Court and opposing counsel's review. He is currently a professor of pharmacology and toxicology at the University of Georgia and has performed extensive research on the effects of different drugs on the body, as well as the social and legal implications of the widespread use and abuse of various legal and illegal drugs. Counsel expects Dr. Tackett to testify about how oxycodone is processed and its capacity for fostering addiction, the physical side effects of the drug, the social dangers associated with oxycodone, and how these

factors compare to other drugs, specifically other opiates, such as heroin. Some considerations will include the potential for polydrug use, neurotoxicity, the average age of the user, the number of overdoses attributable to the drug, the potential for the spread of disease, the long-term health effects, the violence associated with trafficking, and the potential for addiction.

### C. Applying the above conclusions, the resulting drug responsibility of Ms. Goduto should be 915.93 g oxycodone, or 457.97 kilograms of marijuana.

The probation officer found that Ms. Goduto was responsible for 32,425 (30 mg) tablets, 530 (80 mg) tablets, 60 (40 mg) tablets, and 120 (20 mg) tablets of oxycodone. Applying the 10.2% reduction to achieve the amount of actual drug would make Ms. Goduto responsible for a total of 915.93 g of actual oxycodone, as opposed to 1019.95 g of oxycodone hydrochloride, as calculated by the probation officer. If the conversion of associated with other opiates, such as morphine and hydrocodone, is used (as advocated above), the resulting conversion to marijuana is

$$500 \text{ g marijuana} \times 915.93 \text{g oxycodone} = 457.97 \text{ kilograms marijuana}$$

Even if the conversion of heroin to marijuana is used, the result is

$$1000 \text{g marijuana} \times 915.93 \text{g oxycodone} = 915.93 \text{ kilograms marijuana}$$

The resulting base offense level associated with the former conversion ratio is thus 28, 30 with the latter.

## II. There is no factual or legal basis for a firearm enhancement.

The probation officer assessed a two-level enhancement for possession of a firearm during a drug trafficking crime. The firearm at issue was an unloaded pistol and an unattached magazine, located in the console of Mark O'Brien's vehicle when he and Ms. Goduto were arrested.

It is the government's burden to establish by a preponderance of the evidence that the firearm was present during the charged conduct or that the defendant possessed the firearm during conduct associated with the offense of conviction. United States v. Marquez, 685 F.3d 501, 508 (5th Cir. 2012). The government must first meet this burden before the defendant can be required to demonstrate that a connection between the firearm and the offense was clearly improbable. United States v. Stallings, 463 F.3d 1218 (11th Cir. 2006). Further, the firearm must have some purpose or effect with respect to the crime of conviction; its presence cannot be the result of accident or coincidence. Id.

The government cannot meet its initial burden to show the firearm located in a truck belonging to a co-defendant was possessed during the conduct charged or associated with oxycodone trafficking. The only conduct alleged to have taken place in the vehicle was the arrest itself. There is no evidence to suggest that Ms. Goduto owned or possessed the gun, or even that she knew the gun was in the vehicle. Likewise, there is no evidence that Ms. Goduto or any of the conspirators

at any time used or carried a firearm in their illicit activities. Even if the evidence suggests that Ms. Goduto "possessed" the gun that was in the vehicle, "the government must (still) show some nexus *beyond mere possession* between the firearms and the drug crime." Id. at 1221. See also United States v. Siebe, 58 F.3d 161, 162-63 (5th Cir. 1995). In Stallings, the Eleventh Circuit held that assessment of a firearms enhancement was clearly erroneous where firearms were found in a home resided in by defendant Johnson and other adults, no drug paraphernalia was located, and no evidence was presented showing Johnson used or carried a firearm during drug transactions. Because the government has not and cannot meet this burden, there should be no two-level enhancement under USSG 2D1.1(b)(1). Even if the government met this burden during the sentencing hearing, Ms. Goduto will be given the opportunity to show that a relationship between the gun and the offenses charged was "clearly improbable."

### III. There is no basis for a conclusion that Ms. Goduto maintained a "criminal livelihood" under USSG §2D1.1(b)(14).

The probation officer suggested a total increase in Ms. Goduto's offense based on her role in the offense. Not only did Ms. Goduto receive the maximum four-level increase for aggravating role, but she also received an additional two-level increase for "criminal livelihood" under USSG 2D1.1(b)(14)(B) and (E). USSG 2D1.1(b)(14) states that a defendant may receive a two-level increase over and above aggravating role if (s)he is assessed an aggravating role and one of five

factors are present. The probation officer concluded that Ms. Goduto met two of the five criteria—under subsection (B), that she knew that an individual was "*unusually vulnerable* due to a physical or mental condition or otherwise *particularly susceptible to the criminal conduct*, distributed a controlled substance to that individual or involved an individual in the offense," and also under subsection (E), that she "committed the charged offense as part of a pattern of criminal conduct engaged in as a livelihood." USSG 2D1.1(b)(14)(B) and (E).

There is no evidence that Ms. Goduto targeted individuals "unusually vulnerable" or "particularly susceptible" to commit the conduct outlined in the offense. In fact, Ms. Goduto was introduced to the process of forging prescriptions and selling the pills by one of her co-conspirators who was using oxycodone and forging prescriptions for herself and others. Ms. Goduto, being addicted to methamphetamine and having substantial gambling debt (which will be addressed in a later section of this memorandum), used the proceeds of this illegal conduct to fund her own addictions. To the extent she did any "recruiting" of her co-conspirators, they were not more susceptible or more vulnerable than any sellers in average drug trafficking crimes. Drug trafficking, by its very nature, involves sale to support personal drug habits and payment in the form of portions of the drugs sold, and Ms. Goduto's case in no way falls outside the heartland of drug cases in that regard.

Likewise, Ms. Goduto did not have a "criminal livelihood." An assessment of a two-level increase under this subsection requires that two prongs be met: (1) that she derived income in any twelve-month period during the conspiracy that exceeded 2000 times the federal minimum wage, and (2) that the totality of the circumstances shows that the criminal conduct was her primary activity during that twelve-month period. First, there is no basis—nor any assertion made by the probation officer or the government—that Ms. Goduto made more than 2000 times the federal minimum wage off the sale of oxycodone alone. See United States v. Manuel, 912 F.2d 204 (8th Cir. 1990) (enhancement not allowed where there was no specific showing that defendant made 2000 times the federal minimum wage in illegal proceeds). Second, Ms. Goduto was financially supported by her gainfully employed mother and lived at her mother's residence during the time of the conspiracy. At the time of her pre-sentence interview, she had no assets or liabilities. Therefore, an assessment under this subsection is inappropriate.

### IV. Criminal History Category III overrepresents Ms. Goduto's criminal background.

Ms. Goduto has only one misdemeanor conviction and no felony convictions. In 2008, she was convicted of Abandonment of Controlled Substances and sentenced to twelve months probation. As a result of the conviction of the offense for which this Court will sentence her, the balance of probation in the misdemeanor case was revoked, resulting in a ten-month sentence.

Because of this sentence alone, she was assessed two criminal history points, and, because the instant offense was committed while she was on probation for that misdemeanor, she was assessed two additional points. A total of four points corresponds to Criminal History Category III. A total of three would have placed her in Category II. Because she has only a misdemeanor conviction and was revoked based on the current conduct alone, it is appropriate to conclude that a Criminal History Category I would be most commensurate with her history.

**V.   In light of Ms. Goduto's social, familial, educational, medical, and psychological background, the Court should assess a sentence below the applicable guidelines.**

Ms. Goduto has been evaluated extensively since her arrest. She was first evaluated by Myles Hassler, a licensed professional counselor, September 7, 2011. She was later evaluated at Deyton Detention Center October 12, 2011, by Jonathan Lipman, Ph.D. Copies of the assessments will be delivered to the Court and opposing counsel by email or facsimile, as they contain confidential and otherwise sensitive information.

Ms. Goduto is 29 years old. As the evaluations attest, Ms. Goduto had an unusually difficult childhood and young adulthood. Her father and brother are co-defendants in this case. Her mother is a recovering alcoholic and breast cancer survivor, and her father is a heroin addict. Kristen grew up finding needles in the

house, seeing her father chased and arrested by police, and bearing witness to her father's physical abuse of her, her mother, and her two brothers.  At one point, Ms. Goduto's family was supervised by the Department of Family and Children's Services.

When Ms. Goduto was seven, her mother was diagnosed with cancer and endured months of radiation, chemotherapy, and, ultimately, a mastectomy.  When Kristen was twelve years old, as a result of her father's drug use, physical abuse, and unfaithfulness, her parents divorced, and Kristen was placed in her mother's custody.  She saw her brother and co-defendant, Kory, begin to experiment with and sell drugs.  She moved through a series of destructive romantic relationships, and became bulimic.  Her current incarceration has revived the eating disorder, and her jail records confirm that she has been purging, losing weight, and caused extensive damage to her teeth as a result of vomiting.

At Age 23, Ms. Goduto became pregnant and had an abortion.  She cites this event as the trigger for her methamphetamine usage.  She attempted suicide with a combination of Xanax and alcohol.  Thereafter, she began to use methamphetamine because it "made her numb," and helped her to cope with the guilt and pain of the abortion and her subsequent break-up with her boyfriend.  She eventually began to snort methamphetamine daily, until and including the day of her arrest in May 2011.  Toward the end of that period, she was consuming up to

one gram per day. She fell into the trap of "speedballing," or using Xanax to counteract the anxiety and sleeplessness that accompanies methamphetamine usage.

When she began to use methamphetamine, she met a group of people who forged prescriptions and taught her how to do so. It was upon meeting this group of people that she had her only other arrest. She started dating co-defendant Ajian Green, who encouraged her to continue to forge prescriptions so that she could make enough money to bond him out of jail upon his arrest. He promised her he would take the blame if she were ever arrested, and the influence of the drugs she was using made her believe that was possible. She began to obsessively pick at her face, a common characteristic of methamphetamine usage. The scratches have recently recurred and appear to have given rise to a serious skin infection. The medical staff at Deyton has reportedly requested that she be taken to a specialist for treatment, but that request was denied by the United States Marshall as "cosmetic."

Ms. Goduto has been incarcerated at the Deyton Detention Facility since September 2011—nineteen months since she self-surrendered. She was initially granted bond in federal court, on the condition that she live with her grandmother, who then lived with Kristen's mother. The magistrate ordered that Kristen not be allowed to live with her mother, so Kristen's grandmother rented an apartment for

the two of them. Kristen was out on bond for about two months before Cobb County began to initiate probation revocation proceedings. Ms. Goduto turned herself in and consented to revocation of her federal bond, then pled guilty in federal court. With the assistance of the government, Cobb County assumed custody of Ms. Goduto, and her probation was revoked. She was then turned back over to federal custody and has been in Deyton ever since. She has had a multitude of medical problems during her incarceration—the aforementioned bulimia and ensuing dental pain, for which the only remedy available is removal of the tooth, ankle pain from a previous injury, which is continually aggravated, and an assortment of other physical and emotional grievances associated with nineteen months of pre-trial, non-contact, minimal outdoor time, incarceration.

Even if the Court does not believe that the guidelines are inappropriately arrived at by the probation officer, under the circumstances, Ms. Goduto's hardship and current oppressive pre-sentencing incarceration show that a sentence according to the strictly calculated guideline range is greater than necessary to achieve the goals codified in 18 USC 3553(a)(1).

## VI.   Conclusion

In light of the foregoing, Ms. Goduto's guidelines should be calculated as follows. The conversion ratio of oxycodone to marijuana should be commensurate with the ratios for other opiates, and certainly not 6.7 times that of heroin. Using a

conversion ratio of 1:500 and the weight of actual oxycodone, Ms. Goduto's base offense level should be 28.  If she were assessed a four-level enhancement for aggravating role, but no firearm or criminal livelihood enhancement, and have the offense level reduced by three levels as agreed for acceptance of responsibility, her adjusted offense level would be 29.  Because her criminal history is overrepresented by four criminal history points, the Court should find the appropriate Criminal History Category to be I and the resulting guideline range to be 87-108 months, then sentence her to the least sentence likely to meet the requirements of 18 USC 3553.

      Respectfully submitted this 29th day of April, 2013.

*Bruce S. Harvey*
Georgia Bar No.  335175

*Jennifer S. Hanson*
Georgia Bar No.  001698

Attorneys for Defendant/Attorneys to be noticed
Bruce@bharveylawfirm.com
Jennifer@bharveylawfirm.com
Joy@bharveylawfirm.com
146 Nassau Street
Atlanta, Georgia  30303
(404) 659-4628
Facsimile (404) 681-3953

## **CERTIFICATE OF SERVICE**

The attached Sentencing Memorandum has been filed through the Court's CM/ECF filing system, which electronically serves the pleading on opposing counsel, Brock Brockington and Elizabeth Hathaway at the following email addresses:    Brock.Brockington@usdoj.gov

Elizabeth.Hathaway@usdoj.gov

This 29th day of April, 2013.

*Bruce S. Harvey*

*Jennifer S. Hanson*