IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | |
| KRISTEN NOELLE GODUTO, ET AL | : | NO. 1:11-CR-230-JEC-GGB |
| | : | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | |
| TERRY RANDY WALLACE | : | NO. 1:11-CR-17-JEC-GGB |
| | : | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | |
| CARL CLIFTON LEWIS | : | NO. 1:11-CR-18-JEC-GGB |
| | : | |
| | : | |

CORRECTED GOVERNMENT'S GENERAL SENTENCING MEMORANDUM

Comes now the United States of America, by Sally Quillian Yates, United States Attorney, and Elizabeth M. Hathaway and C. Brock Brockington, Assistant United States Attorneys for the Northern District of Georgia, and files this General Sentencing Memorandum to address sentencing positions applicable to the sentencings set for this case on May 13, 2013.

**I.**

**INTRODUCTION**

On January 19, 2011, a grand jury sitting in the Northern District of Georgia returned indictments charging Terry Wallace and Carl Lewis (separately) with, *inter alia*, conspiring to possess a

controlled substance (oxycodone) with the intent to distribute. (Doc. 1 in Case Nos. 1:11-CR-17 and 1:11-CR-18). Then, on May 10, 2011, a grand jury sitting in the Northern District of Georgia returned an indictment charging all but one of the remaining defendants with conspiring to possess a controlled substance (oxycodone) with the intent to distribute. (Doc. 9 in Case No. 1:11-CR-230[1]). Finally on October 17, 2012, a grand jury sitting in the Northern District of Georgia returned a superseding indictment charging added Ajian Greene as a co-conspirator. (Doc. 330). These cases all arise out of the same criminal conspiracy headed by Defendant Kristen Goduto to forge prescriptions for oxycodone, and to pass those prescriptions at pharmacies so that the conspirators could obtain drugs to distribute. All defendants have pleaded guilty to the conspiracy charge.

## II.

### DISCUSSION

With two exceptions, the Government will be recommending that the Court sentence the Defendants to terms of imprisonment within the Sentencing Guidelines.[2]   The Government believes that

---

[1]  All Docket citations are in Case No. 1:11-CR-230, unless otherwise noted.

[2]  The Government has agreed to variances for Kory Goduto, who is a career offender, and Mark O'Brien, whose personal participation is difficult to determine. In addition, this memorandum does not address departures pursuant to U.S.S.G.

Guidelines sentences are appropriate in this case to avoid unwarranted sentencing disparities.  See 18 U.S.C. § 3553(a)(6). While some defendants participated more than others, this fact is already accounted for (1) in the base offense level, because each defendant is being held accountable only for the specific conduct in which he or she participated;[3] and (2) through role adjustments. Further, the Guidelines adequately balances the factors the Court should consider pursuant to Title 18, United States Code, Section 3553(a), specifically (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; and (4) the need to protect the public.

      As the nature of the offense is common to all defendants, the Government addresses it here.  Further, because the role assessments are best understood when the case is viewed as a whole, the Government also addresses role.

_____

§ 5K1.1, which will be filed separately.

      [3]   Regarding the two exceptions, Kory Goduto and the Government agreed to jointly recommend a specific sentence to the Court, and Mark O'Brien and the Government agreed to a four-level downward variance.

**A.**   **Nature of the Drug Possessed in this Conspiracy**

This conspiracy involved the possession of oxycodone, a Schedule II controlled substance.  See 21 C.F.R. § 1308.12.  As discussed below, oxycodone is a dangerous -- even lethal -- drug when abused, and its distribution can be highly profitable for the illicit dealer.

Oxycodone is a semi-synthetic opiate.  See *Drugs of Abuse*, *A DEA Resource Guide*, at p. 41, attached hereto as Ex. A.  As a Schedule II controlled substance, oxycodone may be prescribed lawfully by a physician and is used primarily for pain relief.  Id. However, as an opiate, oxycodone has effects similar to opium and heroin, and, when abused, can be deadly.  Id.  In recent years, oxycodone abuse has increased dramatically.  See Centers for Disease Control and Prevention, Morbidity and Mortality Weekly, Drug Overdose Deaths — Florida, 2003-2009, July 8, 2011, attached hereto as Ex. B.  For example, the CDC has analyzed drug overdose deaths in the state of Florida,[4] and found that the death rate for oxycodone increased by over 264% during that period.  Id.  Indeed, in 2009, the death rate for oxycodone overdose was greater than the death rate for overdoses of heroin, cocaine, methamphetamine, ecstacy and other illegal drugs combined.  Id.

---

[4]   Florida, like Georgia, did not have a prescription monitoring program during this time period.  See Ex. B at p. 3.

The sale of oxycodone can be extremely profitable for the illicit dealer. For example, in this case, using forged prescriptions, conspirators were able to obtain 120 oxycodone pills from a pharmacy for approximately $122. See Ex. C; see also Doc. 1 at ¶¶ 13-17 (complaint outlining co-Defendant Kristen Goduto's obtaining these 120 oxycodone pills). Defendants Kristen and Kory Goduto were able to sell these pills for at least $10 each. See Doc. 221-1 at p. 5 (Defendants Kristen and Kory Goduto were able to pay off $60 of their debt to co-defendant Georgia Hulsey by giving her 6 oxycodone pills). In other words, Defendants could make over approximately $1,000 with $120 worth of oxycodone pills.[5] Further, the cost of purchasing illicit oxycodone has gotten so high that many addicts are turning to heroin -- which can be purchased more cheaply -- dramatically increasing the numbers of people addicted to heroin. See Donna Leinwand Ledger, *OxyContin a gateway to heroin for upper-income adults*, USA TODAY, April 25, 2013, attached hereto as Ex. D.

Accordingly, while the sentences faced by Defendants are significant, they are appropriately so given the very serious nature of the offense. Further, significant sentences are appropriate because Defendants engaged in the conduct repeatedly over a lengthy period of time -- even after they themselves, or

---

[5] Assuming costs for the drugs and for paying people to pass the prescriptions at the pharmacies. See, e.g., Doc.221-1 at p. 5.

conspirators they knew, were incarcerated at the state level. Apparently, because those sentences (often misdemeanors) were not substantial, Defendants were undeterred in continuing their conduct.  Thus, the significant sentences called for by the Guidelines are warranted.

**B.**   **Defendants' Roles in the Conspiracy**

As discussed in more detail below, this organization was headed by Kristen Goduto.  Ms. Goduto would manufacture and forge prescriptions, determine when and where the prescriptions should be passed, and provide the money to pay for the drugs.  At times, she would also pass the prescriptions.

Working closely with Ms. Goduto was her brother, Kory Goduto. Kory Goduto would, at times, supervise individuals who went to the pharmacies to pass the prescriptions (i.e., the "runners"). He also helped oversee the conspiracy's operating costs.

Ryan Trento and Ajian Greene also supervised the runners. Each of these co-defendants would drive various runners to the pharmacies to pass prescriptions, maintaining control of the prescriptions and the money to pay for the prescriptions they got from Kristen Goduto until they reached the pharmacies, and receiving the drugs from the runners when the runners exited the pharmacies.

Mark O'Brien maintained a residence that Kristen Goduto used to manufacture the forged prescriptions up until DEA searched it. He also drove Kristen Goduto to sell the oxycodone pills.

Lori Anderson was a front office supervisor for a doctor that specialized in pain management.  In that capacity, she would falsely verify the prescriptions when pharmacies called.

The remaining defendants were all runners who would take the prescriptions that Kristen Goduto manufactured to the pharmacies to have them filled.

In terms of role adjustments, the Court should find as follows:

### 1.   Kristen Goduto Was the Organizer/Leader

This conspiracy was led by Kristen Goduto.  Ms. Goduto would manufacture and forge the prescription for oxycodone, would determine when and where the co-conspirator would pass the prescription, would receive drugs obtained, and would pay the runners for their services.  She also recruited others into the conspiracy.  As such, she should receive a four-level leadership enhancement pursuant to U.S.S.G. § 3B1.1(a).  Indeed, Ms. Goduto does not object to PSR's recommendation that the enhancement applies.  See KRISTEN GODUTO PSR ¶ 38.

### 2.   Kory Goduto, Ryan Trento and Ajian Green are Manager/Supervisors

Next, Kory Goduto, Ryan Trento and Ajian Greene were all managers/supervisors of this organization.  Accordingly, the Court

7

should increase each of their base offense levels by three levels. See U.S.S.G. § 3B1.1(b).

In order to receive a role enhancement, a defendant need only to have asserted control over one individual. U.S.S.G. § 3B1.1 cmt. n.2; United States v. Jimenez, 224 F.3d 1243, 1251 (11th Cir. 2000). The defendant need not have supervised the co-participant for the entire conspiracy, so long as some supervision occurred during the course of the conspiracy. See United States v. Stott, 245 F.3d 890, 912-13 (7th Cir. 2001), as amended by 15 Fed. App'x 355 (7th Cir. 2001) (finding leadership adjustment applicable where evidence showed that defendant "coordinated [co-participant's] activities for some part of the conspiracy"). Further, the fact that the defendant may have played a subordinate role to his boss does not relieve him of liability for directing someone under him. See United States v. Jones, 933 F.2d 1541, 1546-47 (11th Cir. 1991) (defendant's subordinate role to leaders does not absolve him of supervisory role he played in organization). The Government bears the burden of demonstrating that the defendant was a supervisor or manager by a preponderance of the evidence. United States v. Yeager, 331 F.3d 1216, 1226 (11th Cir. 2003).

### a.   Kory Goduto

The Court should find that Kory Goduto is a manager/supervisor because he, at times, oversaw co-conspirators as they went to pharmacies to pass prescriptions. See KORY GODUTO PSR ¶¶ 20, 33;

Doc. 221-1 at 4.   In that case, once the co-conspirator obtained the drugs, he or she would give the drugs to Kory or Kristen Goduto, who would then sell the drugs. KORY GODUTO PSR at ¶ 33; see also Doc. 221-1 at p. 4.   In addition, Kory Goduto oversaw the conspiracy's finances with Kristen Goduto, including money owed to the conspirators who passed the prescriptions. KORY GODUTO PSR at ¶ 20; Doc. 221-1 at p. 4; Doc. 246-12-13.

For example, on February 4, 2010, Kory Goduto drove co-defendant David Tanner to the Bradley and Bandy Pharmacy so that Tanner could pass a forged prescription for 120 30mg oxycodone pills. See Doc. 221-1 at p. 4.   While Tanner was in the pharmacy, Kory Goduto kept tabs on Tanner's progress by texting him back and forth. Id.   Ultimately, however, the plan was thwarted when the pharmacist discovered that the prescription was a forgery. Id.

With respect to the conspiracy's finances, on September 24, 2010, a confidential source ("CS") working with the DEA recorded a meeting with Kristen and Kory Goduto. See Doc. 1 at ¶ 13.   At one point during that meeting, Kristen and Kory Goduto discussed finances among themselves, but in earshot of the CS. Id. at ¶ 14. Specifically, Kory Goduto stated that Kristen Goduto paid "Ann" (co-conspirator Georgia Ann Hulsey) the $100 that Kristen Goduto owed her, and $140 "because [we] split so Ann is taken care of." Id. Kory Goduto then listed off prices of prescriptions stating, "the first one cost one-twenty, the second one cost one-fifty and

9

the third one cost one-seventy-five." <u>Id.</u>   Kristen GOduto responded that she had provided Kory Goduto $510, and stated that she gave him an amount of money in front of an individual named "Levi" (co-conspirator Levi Stigall).   <u>Id.</u>   They then discussed paying Hulsey once again, with Kory Goduto stating that Hulsey took six pills which reduced what they owed her to $280.   <u>Id.</u>; Doc. 221-1 at 5.   Kory Goduto went on to explain that they split the debt, each paying Hulsey $140.   <u>Id.</u> at ¶ 14.   Kory Goduto then stated, "After the prescriptions, you would only owe me thirty-two bucks." <u>Id</u>.

Accordingly, the evidence shows that Kory GOduto was a manager/supervisor.

**b.   <u>Ryan Trento and Ajian Greene</u>**

Ryan Trento and Ajian Greene also played supervisory roles as they (individually and together) drove co-conspirators to pharmacies to pass prescriptions and provided the co-conspirators with the forged prescriptions, as well as the money to pay for them, when they reached the pharmacy.   <u>See</u> Doc. 370-1 at p. 4; Doc. 393-1 at pp. 4-5.   Defendants would also collect the drugs from the co-conspirators when they returned from the pharmacy.   <u>Id.</u>

For example, on April 5, 2010, Trento drove Carl Lewis to Musicks Pharmacy in order to pass a forged prescription for 120 30mg oxycodone pills.   Doc. 393-1 at p. 5.   Trento held the forged prescription until they reached the pharmacy, and then provided the

10

prescription to Lewis to pass.  Id.  Then, on July 30, 2010, Greene and Trento drove Lewis to the Forsyth Pharmacy in order to pass a forged prescription for 120 30mg oxycodone pills.  Docs. 370-1 at p.4.  Greene held the forged prescription until they reached the pharmacy, and then provided the prescription to Lewis to pass.  Id.

Also on July 30, 2010, Greene, Trento and Lewis went to the Publix pharmacy in Lilburn, Georgia, in order to pass another forged prescription for 120 30mg oxycodone pills.  Docs. 370-1 at p.4.  Video from the Publix pharmacy shows Lewis passing the forged prescription.  Id.  In addition, video from the entryway of the Publix store shows that Greene and Trento were present at about the time Lewis was passing the forged prescription.  Id.

Thus, this evidence shows that Greene and Trento should also receive manager/supervisor role enhancements.[6]

### 3. The Remaining Defendants Should Not Receive Any Role Adjustment

The remaining defendants should not receive any role adjustments, either upward or downward.  Nevertheless, of the 13 defendants to be sentenced, nine assert that they are entitled to role reductions. These defendants bear the burden of proving that

---

[6]  Greene nevertheless argues that his role was minor with respect to these prescriptions because he was acting at the direction of Kristen Goduto.  Doc. 416-8.  However, the fact that he may have been acting at the direction of the organizer does not absolve him of his supervisory conduct with respect to other members of the conspiracy.  See Jones, 933 F.2d at 1546-47 (defendant's subordinate role to leaders does not absolve him of supervisory role he played in organization).

they are entitled to the role reduction, and must do so by a preponderance of the evidence.  United States v. Rodriquez de Varon, 175 F.3d 930, 939 (11th Cir. 1999) (en banc).  In so doing, defendants need to show that they are "substantially less culpable than the average participant."  See U.S.S.G. § 3B1.2 cmt. n. 3(A). Because defendants have not shown that they played a minor role with respect to the conduct being attributed to them, none of them should receive a role reduction.  See de Varon, 175 F.3d at 940 (Court must determine whether defendant played mitigating role in relation to relevant conduct being attributed to him/her).

In determining whether a defendant is a minor participant, the Court conducts a two-step assessment: first, the Court must measure the defendant's conduct against the relevant conduct for which he is being held responsible.  See de Varon, 175 F.3d at 940, 943, 945 (emphasis added).  The step is the most important in assessing whether a defendant is minor and is often the ending point of the inquiry.  Id. (describing this step as "first and foremost" or "[f]irst, and most importantly," noting that this step is "essential to any evaluation of mitigating role," and recognizing that it may be dispositive).  Second, the Court may measure the defendant's role against other participants in the relevant conduct.  Id. at 944-45.[7]

---

[7]  Thus, Hobbs's suggestion that the Court can pick between these approaches, Doc. 411-3, is incorrect.  The Court must assess a defendant's role in relation to his or her relevant conduct.  de

### a. Ajian Greene, Ryan Trento and Kory Goduto are not Minor Players

As an initial matter, Ajian Greene and Ryan Trento have each asserted that they are entitled to a two-level minor role adjustment, and Kory Goduto has asserted that he is entitled to a four-level minimal role adjustment. GREENE PSR ¶ 40; KORY GODUTO PSR ¶ 40; TRENTO PSR ¶ 40. For the reasons discussed above, these individuals are not only not minor/minimal players in this conspiracy, they are managers/supervisors. Thus, their requests for downward role reductions should be denied.[8]

### b. Pasquale Goduto, Georgia Hulsey, Phillip Hobbs, Carl Lewis and David Tanner are All Equally Culpable Runners

Next, Pasquale Goduto, Georgia Hulsey, Phillip Hobbs and David Tanner all assert that they are minor participants. Carl Lewis

---

Varon, 175 F.3d at 940, 943, 945.

[8] Although his Sentencing Memorandum fails to include any direct references to Section 3B1.2, Greene also claims to have a "relatively minor role." Doc. 416-8, see also GREENE PSR ¶ 40. As discussed above, the fact that Greene may have been less culpable than Kristen Goduto does not make him a minor participant. Also, in his attempt to persuade this Court, Greene highlights three periods of incarceration during the life of the conspiracy that presumably suggest that his role in the offense was minor or minimal as compared to his co-conspirators. See Doc 416-7, 9. However, the fact that Greene was in custody for part of the time during the conspiracy does not absolve him from responsibility for what he did between stints in jail: manage and supervise the passing of forged prescriptions. See Stott, 245 F.3d at 912-13 (defendant need not have supervised for entire conspiracy to be eligible for role enhancement). Since Greene is only being held accountable for his actual conduct in the offense, the fact that he was not present during the entire conspiracy is irrelevant.

asserts that he falls in between a minor and minimal participant
(and thus should receive a 3-level downward adjustment). As none of
these defendants have shown that they are substantially less
culpable than the average participant in the relevant conduct
attributable to them, their requests should be denied.

### 1) Pasquale Goduto

Pasquale Goduto was a runner for this conspiracy, passing a
forged prescription on May 24, 2010. See P. GODUTO PSR at ¶¶ 21, 33.
The PSR holds Pasquale Goduto responsible only for the prescription
he personally passed.   P. GODUTO PSR ¶ 38.[9]   Nevertheless, in
seeking a role reduction, P. Goduto argues that "the indictment
contains 10 additional co-defendants and outlines nearly two years
of misconduct, while defendant is only responsible for one
incident[.]" P. GODUTO PSR ¶ 42.   Thus, he argues that he is a minor
participant because he is responsible for only 0.4% of the total
number of pills at issue.   Id.   However, P. Goduto's argument has
been explicitly rejected by the Eleventh Circuit; that is, a
defendant cannot argue that his relevant conduct should be limited
to his personal conduct, and then argue that role should be
determined by looking at the conspiracy as a whole.   de Varon, 175
F.3d at 941 (noting defendant cannot argue that his/her relevant
conduct was narrow for purpose of calculating his/her base offense

---

[9]   Based on further investigation, the Government now agrees
that there is only evidence to support P. Goduto's passing of the
May 24, 2010 prescription.

level, but broad for determining role in offense).  As the Circuit
stated,

> where the relevant conduct attributed to a
> defendant is identical to her actual conduct,
> she cannot prove that she is entitled to a
> minor role adjustment simply by pointing to
> some broader criminal scheme in which she was
> a minor participant but for which she was not
> held accountable.

<u>Id.</u>  Here, P. Goduto offers no basis for finding that he was a
minor -- let alone minimal -- participant with respect to the
prescription(s) he personally passed.  On the contrary, his conduct
was similar to all of the other runners in this conspiracy.
Accordingly, his request for a role reduction should be denied.

### 2)   **Georgia Hulsey**

Georgia Hulsey was another runner who passed prescriptions for
this conspiracy.  HULSEY PSR at ¶ 24.

While Hulsey properly focuses on her relevant conduct, she
argues that she is entitled to a minor role reduction because
other co-conspirators picked her up; provided her with money,
identifications, and the prescriptions; and transported her to the
pharmacies.  HULSEY PSR ¶ 41.  However, as discussed above, Ryan
Trento and Ajian Greene, the people who drove her and provided her
with the prescriptions and money, should be given a upward
supervisory role adjustment.  The fact that Hulsey played a lesser
role than a supervisor does not make her minor.  <u>See de Varon</u>, 175
F.3d at 944 (defendant not entitled to role reduction merely

because he was somewhat less culpable than other participants). Moreover, other runners were also transported to the pharmacies and given the prescriptions and money there. See Doc. 414-6 (Tanner's argument that he is minor because he was driven to pharmacies); Doc. 52 (Case No. 1:11-CR-18) (Lewis's argument that Tanner, Howard, Wallace and Lewis all minor because they were driven to the pharmacies). Thus, if Hulsey were correct, then nearly half the defendants in this case would be minor participants. Hulsey simply fails to show how she is substantially less culpable than the average participant.

### 3)   David Tanner

David Tanner was a third runner who passed prescriptions for this conspiracy. TANNER PSR at ¶ 28.

Tanner argues that he is a minor player first because he is accountable for only 2% of the pills involved in the conspiracy. However, as discussed above in relation P. Goduto, this argument has been rejected by the Eleventh Circuit. Because Tanner's relevant conduct has been limited to the prescriptions he actually passed, an assessment of minor role must be based solely on the occasions where he personally passed the prescriptions. See de Varon, 175 F.3d at 941.

Next, Tanner argues that he is minor because he did not choose which doctors' names to place on the prescriptions, he was not involved in the ruses to make them appear legitimate, he was not

involved in preparing the forged prescriptions, he did not choose the pharmacies where the prescriptions were filled, he did not drive himself, he did not choose the pharmacies to be filled and he turned the drugs immediately over to Kory Goduto. Doc. 414-6. However, all the activities Tanner described – except driving Tanner to the pharmacies – were conducted by Kristen Goduto, the leader/organizer of the conspiracy. The fact that Tanner is less culpable than her does not make him minor. See U.S.S.G. § 3B1.2 cmt. n. 3(A) (defendant must show that he is *substantially* less culpable than the *average* participant) (emphasis added). Similarly, the fact that he is less culpable than a manager/supervisor like Kory Goduto, who drove him to the pharmacy, also does not make him minor. Id.

Finally, Tanner asserts that he is less culpable because he filled prescriptions in his own name, presented his own identification, and walked through security video surveillance, whereas other co-conspirators used fake identifications. Doc. 414-6. However, other co-conspirators also passed prescriptions in their own names, used their identifications, and walked through surveillance. Even if they hadn't, Tanner fails to show that these facts show that he is substantially less culpable than the average participant. Thus, he should not get a minor role reduction.

17

### 4)   **Phillip Hobbs**

Phillip Hobbs was a fourth runner who passed prescriptions for this conspiracy.  HOBBS PSR at ¶ 21.

Hobbs suggests that due to his drug addition and mental state he was manipulated by Kristen Goduto.  Doc. 411-5-6.  However, the evidence in this case shows that many of the runners were manipulated by Kristen Goduto, many because of their drug addition.  Moreover, even if he were more susceptible to manipulation, Hobbs fails to show that his conduct -- going into the pharmacies and passing prescriptions -- was substantially less culpable than the average participant.

### 5)   **Carl Lewis**

Carl Lewis was a fifth runner who passed prescriptions for this conspiracy.  LEWIS PSR at ¶ 35.

Lewis argues that he is entitled to a <u>three</u> level role reduction because "he played a role somewhere between a minimal and minor participant."  Doc. 52 (Case No. 1:11-CR-18)-16.  In so doing, Lewis defines four categories of participants: (1) the organizer/leader (Kristen Goduto); (2) mid-level managers (O'Brien,[10] Greene and Kory Goduto); (3) "multi-role conspirators" (Hulsey Pasquale Goduto, Stigall, Clingerman, Trento, Hobbs, and Anderson); and (4) "single role conspirators" (Tanner, Howard,

---

[10]  The Government disagrees that O'Brien acted as a manager in this conspiracy.

Wallace and himself). <u>Id.</u> at 17-20.  By claiming he is less culpable than a "multi-role conspirator" Lewis argues that he is entitled to a downward role adjustment.  Lewis fares no better than the others.

First, Lewis fails to show how his participation in the relevant conduct for which he is held accountable is minor.  Like Tanner and Hulsey, although Lewis was driven to the pharmacies by Greene and Trento, Lewis physically went into the pharmacy to pass the prescription.  The fact that Lewis may be less culpable than them does not mean he should receive a role reduction because Greene and Trento should get role enhancements.  <u>See</u> Part B.2.b, <u>supra</u>.[11]

Indeed, Lewis' conduct was no different than Hulsey, Pasquale Goduto, Stigall or Hobbs, yet, he attempts to distinguish himself from them by finding nuanced differences and calling them significant.  However, even with these minor differences, Lewis fails to show that he was substantially less culpable than them. <u>See</u> U.S.S.G. § 3B1.2 cmt. n. 3(A).

---

[11]  Lewis fails to explain how Trento – who Lewis admits "drove others, distributed prescriptions to runners, collected pills from runners, and recruited" members of the conspiracy – is not a supervisor.  See Doc. 52-18.  This is especially incongruent given that he would place Ajian Greene, who also "distributed prescriptions to runners; drove runners to location; ... and collected pills after a run" as a manager.  See Doc. 52-17.  The only distinction Lewis draws between Trento and Greene is that Greene was Kristen Goduto's boyfriend and that he acted as a lookout.  Neither of these facts would serve to make Greene a supervisor and Trento not.

For example, Lewis asserts that he is substantially less culpable than Hobbs because Hobbs drove to pharmacies and used a cell phone given to him by Kristen Goduto.   See Doc. 52-18. However, Lewis does not explain how driving himself (rather than being driven) or having a telephone given to him by the organizer (rather than using his own) makes Hobbs substantially more culpable than him.   Once at the pharmacy, Lewis and Hobbs engaged in the same conduct.   Similarly, Lewis fails to show how the fact that Georgia Hulsey may have driven with others to the pharmacies, makes her substantially more culpable than those who drove alone.[12]   Id. In fact, Hulsey was also driven to the pharmacies in the same manner as Lewis.   Cf. Doc. 196-1 at 5, with Doc. 393-1 at 5.   The fact that Stigall was also selling pills and carried blank prescriptions is unilluminating since that activity was not part of this conspiracy.   See Ex. E.   Finally, his attempt to show that he is substantially less culpable than Pasquale Goduto because Pasquale Goduto allowed others to use his car falls flat.   Id.

     **c.**  **Lori Anderson is not a Minor or Minimal Participant**

Finally, Lori Anderson requests a four-level minimal role adjustment.   Doc. 415-8-11; ANDERSON PSR ¶ 40.   The minimal role reduction is intended to be used infrequently.   U.S.S.G. § 3B1.2 cmt. n. 4.   It generally applies to those who lack knowledge or

---

[12]   Lewis does not suggest that Hulsey maintained the prescriptions and distributed them to others in the way that Greene or Trento did.   Doc. 52-18.

understanding of the scope and structure of the organization. Id. Anderson's role reduction request should be denied because she had a full understanding to the scope of the organization with respect to her relevant conduct. Further, she played an essential role with respect to it.

During the course of the conspiracy, Anderson held a legitimate job as a front office supervisor of a pain management physician. ANDERSON PSR ¶ 71. This provided an essential element to the success of the forged prescriptions passed under that physician's name: it allowed Kristen Goduto to put the doctor's actual telephone number on the prescription (beneficial because pharmacies could call the doctor's office to verify the prescription) and Anderson was in a position to falsely verify the forged prescriptions if the pharmacy called. See id. at 12. It also made it harder for law enforcement to detect the prescription as a forgery. As such, Anderson's participation practically ensured the success of the prescriptions passed under the doctor's name.

Nevertheless, Anderson asserts that she is entitled to a minimal role reduction because she did not make any decisions that were material to the offense, possessed no supervisory responsibility, did not have control over the drugs or the people who picked up the prescriptions, and did not profit from the offense. Doc. 415-9. Certainly these facts show that she did not

21

possess a supervisory role.  However, except for her claim that she was not paid, these facts are also all true of the runners who passed the prescriptions for which Anderson is accountable, yet Anderson fails to show that she is substantially less culpable than them.  On the contrary, Anderson is perhaps more culpable insofar as she used her unique position as an office supervisor to further the conspiracy's activities and give them an air of legitimacy, while she was in relatively little danger of getting caught.

In sum, none of the defendants should be given a minor role reduction.  The Government recognizes that, in a conspiracy of this size, it may seem odd that no defendant is considered a minor player.  However, the purpose of the minor role adjustment is to allow the Court to impose a sentence more closely mirrors a defendant's conduct when the Guidelines would otherwise hold them accountable more broadly.  See de Varon, 175 F.3d at 941.  Where, as here, each defendant is being held accountable solely for his

actual conduct, it is not surprising that none of them are minor players.  See id. at 944 (recognizing the possibility that there may be no minor participants in the charged organization).

        Dated: This 7th day of May, 2013.

                                    Respectfully submitted,

                                    SALLY QUILLIAN YATES
                                    UNITED STATES ATTORNEY


                                    /s/ELIZABETH M. HATHAWAY
                                    ASSISTANT U.S. ATTORNEY
                                    Bar No. 076212

                                    /s/C. BROCK BROCKINGTON
                                    ASSISTANT U.S. ATTORNEY
                                    Bar No. 775084

                                    600 U.S. Courthouse
                                    75 Spring Street, SW
                                    Atlanta, Georgia 30303
                                    Telephone: (404) 581-6000
                                    Facsimile: (404) 581-6181

**CERTIFICATION OF SERVICE**

This is to certify that the undersigned has this date electronically served the counsel of record in this case the foregoing Sentencing Memorandum.

This the 9th day of May, 2013

_____
/s/ELIZABETH M. HATHAWAY
Assistant United States Attorney